706 F.2d 657
 UNITED STATES of America, Plaintiff-Appellant,
v.
Glynn BATSON, South Plains Land Corporation, a corporation,
and Johnny Lemmons, Defendants-Appellees.
UNITED STATES of America, Plaintiff-Appellant,
v.
Dale LEVERETT, Cletus Leverett and Wayne Leverett, et al.,
Defendants-Appellees.
UNITED STATES of America, Plaintiff-Appellant,
v.
Lois PRATHER, Defendant-Appellee.
UNITED STATES of America, Plaintiff-Appellant,
v.
T.A. WARTES, Wayne Hicks, Bill Wartes and Gene Irwin, et
al., Defendants-Appellees.
UNITED STATES of America, Plaintiff-Appellant,
v.
A. Earl JONES, et al., Defendants-Appellees.
UNITED STATES of America, Plaintiff-Appellant,
v.
Don H. WILSON, et al., Defendants-Appellees.
UNITED STATES of America, Plaintiff-Appellant,
v.
Earl BOWMAN, Ernest L. Bowman, J.E. Aldridge, Don Carmichael
and Estate of Everett M. Bowman, et al.,
Defendants-Appellees.
 Nos. 81-1242 to 81-1248.
 United States Court of Appeals,
Fifth Circuit.
 June 9, 1983.
 
 Judith Rabinowitz, Atty., Civ. Div., U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellant.
 McWhorter, Cobb & Johnson, Jack P. Driskill, Lubbock, Tex., for Lemmons.
 John Saleh, Lamesa, Tex., for Batson, Prather and South Plains.
 John L. Shepherd, Seminole, Tex., for all defendants-appellees.
 Cecil Kuhne, Jas. H. Milam, Lubbock, Tex., for Jones, et al.
 Stephen Weeks, Houston, Tex., for Dempsey J. Prappas.
 Appeals from the United States District Court for the Northern District of Texas.
 Before THORNBERRY, GEE, and GARWOOD, Circuit Judges.
 GARWOOD, Circuit Judge:
 
 
 1
 In this appeal we consider issues arising out of payments made to the defendants-appellees by the Department of Agriculture under the Upland Cotton Price Support Program, 7 U.S.C. Sec. 1444(e), in Gaines County, Texas. In the seven separate suits under consideration in this opinion, the United States sought to recover alleged overpayments made to the forty-six appellees, mostly individuals, under this program. The district court held that the government's suits were barred by the statute of limitations, and, alternatively, that the regulation under which the government sought recovery of several of the payments was unconstitutionally vague and, therefore, invalid. It granted summary judgment on April 3, 1981 in favor of each defendant-appellee.
 
 
 2
 On appeal, the United States seeks reversal and remand of the summary judgments granted. For the reasons below we reverse the seven judgments rendered in appellees' favor, and remand.
 
 I.
 THE FACTS
 
 3
 A. OVERVIEW OF REGULATORY FRAMEWORK.
 
 
 4
 The Upland Cotton Price Support Program in effect in 1972 and 1973 was authorized by 7 U.S.C. Sec. 1444(e). It was one of several price support programs administered by the United States Department of Agriculture ("USDA"). Section 1444(e) authorized the Secretary of the USDA to make loans and subsidy payments, and to require producers to "set aside" cropland, if necessary, to avoid excessive supplies of upland cotton. Section 1444(e) also authorized the Secretary to promulgate regulations to carry out the statutory provisions. Upland cotton loans and subsidy payments were made through the Commodity Credit Corporation ("CCC"), but the program itself was administered in the field by the County and State Committees of the Agricultural Stabilization and Conservation Service ("ASCS").[1]
 
 
 5
 The ASCS County Committees consisted of three locally elected members. These Committees kept records of crop allotments,[2] yields, and their transfers between farms; approved transfers and payments; and provided the first level of enforcement in the program. The ASCS State Committees' function was to ensure that County Committees administered the program in accordance with the regulations. 7 C.F.R. Sec. 718.4 (1974). In the event that a farmer received an adverse determination from a County Committee with respect to the program, USDA regulations provided for a county level redetermination to be made after an informal hearing, and for the right of appeal, first to the State Committee and then to the Deputy Administrator of the ASCS in Washington, D.C. 7 C.F.R. Secs. 780.3-.5. A producer was also entitled to an informal hearing at these two levels of appeal. In these hearings he was entitled to "a full opportunity to present facts and information relevant to the matter in issue and [to] present oral or documentary evidence." 7 C.F.R. Sec. 780.8. The Agricultural Adjustment Act provided that:
 
 
 6
 "The facts constituting the basis for any ... payments under the cotton set-aside program ... when officially determined in conformity with the applicable regulations prescribed by the Secretary ... shall be final and conclusive and shall not be reviewable by any other officer or agency of the Government." 7 U.S.C. Sec. 1385.
 
 
 7
 The payment or subsidy element of the upland cotton program is at issue in this appeal. Sections 1444(e)(2) and (3) of the statute prescribe a formula for determining a sum per pound of upland cotton to be paid to farmers for each crop. The payment is not based on the amount of cotton actually grown in the current year, but on the average of the per acre yield harvested on the farm over the preceding three years. 7 U.S.C. Sec. 1444(e)(3).[3]
 
 
 8
 To be eligible for payments, a producer must first file a "Form 516" with the County Committee which indicates his intention to participate in the upland cotton program. 7 C.F.R. Sec. 722.804(b)(1). A "producer" is defined in the regulations as a "[p]erson who as owner, landlord, tenant or sharecropper, is entitled to share in the crops available for marketing from the farm or in the proceeds thereof ...." 7 C.F.R. Sec. 719.2(s).[4] Before payments are made a producer is also required to file with the County Committee ASCS Form 580 (entitled "Report of Acreage and Certification of Compliance") certifying that he has complied with all of the terms and conditions of the program and requesting payment.[5]
 
 
 9
 Completion of these forms and compliance with all of the program regulations made a producer eligible for a "preliminary payment." This payment provided farmers a calculated estimate of their subsidy, which was paid them "as soon as practicable after July 1 of the year in which the crop [was] harvested," 7 C.F.R. Sec. 722.812(d), presumably to ease their cash flow problems before the regular payment was determined. The initial payments were based on the product of (1) the preliminary payment rate, which in 1973 (the principal year involved here) was fifteen cents per pound; (2) the payment yield (the average production of the past three years in pounds per acre); and (3) the number of acres of cotton allotment actually planted. A "regular payment" rate was calculated following the harvest, but it could not be less than the preliminary rate. The producer was entitled to the excess, if any, of the regular over the preliminary rate. 7 C.F.R. Secs. 722.812(a) and (d).
 
 
 10
 The preliminary payment rate was set forth in the regulations, but the payment yield and the number of allotments were factors to some degree within the control of individual producers. The regulations allowed farmers to sell and lease their cotton allotments which could in turn be combined with the existing allotments of the lessee or buyer, thus affecting payments, yields and allotment totals. Such transactions were referred to in the regulations as "reconstitutions."[6] When allotments from different farms, having different yields, were combined in a so-called "reconstitution," the yield of the "receiving" farm, as designated by the producer, governed the combined allotments. Therefore, to keep the total number of pounds of cotton represented by an allotment the same before and after a reconstitution, the regulations prescribed a "productivity adjustment." 7 C.F.R. 722.420.[7]
 
 
 11
 For example, assume Farm A has ten acres of cotton allotment with a yield of 400 pounds per acre, which represents 4,000 pounds of cotton, and Farm B has ten acres of cotton allotment with a yield of only 200 pounds per acre, which represents 2,000 pounds of cotton. The two farms thus have between them a total of twenty allotment acres representing 6,000 pounds. In a combination of all these allotments, if Farm B were the receiving farm and if no adjustment were made, the result would be a Farm B having all twenty allotment acres, each with a yield of 200 pounds per acre (the B yield). New Farm B would only represent 4,000 pounds of cotton, and 2,000 pounds would be "lost" in the combination. Similarly, 2,000 pounds would be "gained" if Farm A were designated the receiving farm and no adjustment were made (A would have 8,000 pounds, being twenty allotment acres times A's yield of 400 pounds per acre). Section 722.420(b), however, provides a formula for making the necessary adjustment, which says to
 
 
 12
 "[d]ivide the pounds transferred by the payment yield for the receiving farm. The result is the number of acres by which the allotment on the receiving farm is to be increased." 7 C.F.R. Sec. 722.420(b).
 
 
 13
 Thus, in our example, if Farm B were the receiving farm, 4,000 (the number of pounds transferred from A) is divided by 200 (the pounds per acre yield of B) yielding a quotient of twenty. Accordingly, Farm B's allotment acres are increased by twenty in the combination, giving it a total of thirty acres of allotment with a yield of 200 pounds per acre, a total of 6,000 pounds. If Farm A were the receiving farm, its allotments would increase only by five, giving it a total of fifteen allotment acres having a yield of 400 pounds per acre, again a total of 6,000 pounds.[8]
 
 
 14
 The effect of the adjustment, where high yield acres are transferred to a farm having low yield acres, is to increase the number of the transferred allotments by the proportion by which the productivity of the transferred high yield acres exceeds that of the receiving farm. To provide one more example, if a farmer bought ten allotments with a yield of 400 pounds per acre and combined them with his existing allotments, designated as the receiving farm, which had a yield of 200 pounds per acre, he would be credited with a total of twenty additional allotments, not just the ten he purchased. The lower yield of the receiving farm would control for payment purposes, but the producer would not receive less in subsidy payments than the total both parcels would be eligible for individually, because of the additional allotments resulting from the "productivity adjustment" under section 722.420(b).
 
 
 15
 The reconstitution regulations, however, had an additional and complicating aspect which created the present controversy. It involved the difference between the way in which yields were calculated for transfer purposes--i.e., for adjusting the number of allotments when allotments were transferred--and the way in which yields were calculated for payment purposes--i.e., the yield on which the payment at the rate of fifteen cents per pound was based. "Payment" yields were an average of the three growing seasons immediately past. 7 C.F.R. Sec. 722.808(a). Thus, for the 1973 Upland Cotton Price Support Program payment yields were the average of the yields in 1970, 1971, and 1972. Reconstitutions effective for a program year, however, began to occur immediately following the previous growing season, in some cases before yields for that year were calculated. Thus, to enable farmers to proceed with reconstitutions immediately, yields for transfer purposes were based on a three-year average beginning one year earlier--for the 1973 program the relevant years were 1969, 1970, and 1971. 7 C.F.R. Sec. 722.420(b).[9] The USDA expected the transfer and payment yield averages to be substantially similar notwithstanding the differences in the years used for calculating the averages.[10]
 
 
 16
 This seemingly innocent aspect of the regulations, created for the convenience of the farmers and administrators of the cotton program, however, was subject to abuse. By combining allotments through careful reconstitutions which exploited the differences between "transfer" and "payment" yields, program payments could be vastly increased. For example, assume that Farm A's cotton allotment consists of one acre with a transfer yield of 140 pounds per acre and a payment yield of 685 pounds per acre. A would be eligible for a "preliminary" (effectively a minimum) payment of $102.75 ($.15 X 685). Farm B's allotment consists of 100 allotment acres having transfer and payment yields which are each 280 pounds per acre. B would be eligible for payments of $4,200 (100 X 280 X $.15). Assume now that Farm B's 100 allotment acres are all transferred to Farm A. Since Farm B's transfer yield (280 pounds per acre) is twice that of receiving Farm A (140 pounds), the number of allotments transferred would be doubled to 200, due to the productivity adjustment of section 722.420(b), and the new acres from B would also adopt the payment yield (685 pounds per acre) of the receiving farm, A. Payments following the reconstitution would thus be calculated as follows:
 
 
 17
 $.15 X 201 X 685 = $20,652.75.
 
 
 18
 In this example, the receiving farm's low transfer yield allowed the number of allotments to be dramatically increased in the reconstitution, while the receiving farm's high payment yield now applied to each of these allotments. The result is a fivefold increase in total program payments, not because any additional cotton would be planted or grown, but simply because of the way in which allotments and yields were adjusted in the reconstitution. The adjustment formula itself is generally sound. The inflation of the payments, however, resulted from the unrealistic yields which were plugged into the formula and the contrast between the receiving farm's relatively low transfer yield and high payment yield.[11]
 
 
 19
 The situation anticipated by the USDA was one in which transfer and payment yields would be roughly the same, and thus total program payments would be roughly the same before and after the reconstitution. In the just preceding example, if the transfer and payment yields of Farm A, as the receiving farm, had both been 140, the number of allotments would still be doubled in the transfer, but the payment equation would have been:
 
 
 20
 $.15 X 201 X 140 = $4,221.00.
 
 
 21
 If the transfer and payment yields on receiving Farm A had each been 685, the number of transferred allotments would have been adjusted downward from 100 to 40.9 to account for the higher yield of the receiving farm,[12] and the payment equation would have been:
 
 
 22
 $.15 X 40.9 X 685 = $4,202.48.
 
 
 23
 These totals approximate the sum of the payments on the two farms had they been computed individually:
 
 
 24
 $102.75 (A) + $4,200.00 (B) = $4,302.75.
 
 
 25
 This rough equivalence was expected by the USDA in spite of any reconstitutions. Such was not the case in our example, however, because the payments for the combined allotments could be based on the receiving farm's high "payment" yield of 685 pounds per acre, while the transferred allotments themselves could be doubled because of the receiving farm's low "transfer" yield. By transferring allotments in this way, program payments could be vastly increased.[13]
 
 
 26
 Although not specifically addressing the foregoing form of manipulation, the regulations imposed certain restrictions on the right to transfer allotments and to receive payments, several of which are pertinent to this appeal. Allotments could not be transferred to a farm which had none, and reconstitutions of farms with allotments were not allowed if the County Committee determined that "the primary purpose of the change in operation [was] to establish eligibility to transfer allotments subject to sale or lease." 7 C.F.R. Sec. 719.3(d)(1). In addition, allotments could only be transferred to farms with nonallotted cropland acreage sufficient to carry the new allotments. 7 C.F.R. Sec. 722.420(b)(2). See notes 7 and 8, supra. The "productivity adjustment" used when allotments were combined has been discussed above; additionally, there were also specific regulations with respect to the allocation of the allotments when farms were divided. 7 C.F.R. Sec. 719.8.
 
 
 27
 With respect to payments, a limitation of $55,000 per person was prescribed in section 722.801(c). For purposes of enforcing the payment limitation, the regulations defined "person" as an individual or legal entity which had, and exercised, responsibility for a separate and distinct interest in the land or crop involved, and which was responsible for the costs of farming from a fund or account distinct from that of any other individual or entity. 7 C.F.R. Sec. 795.3.[14] Partnerships, joint ventures, tenancies in common, and joint tenancies were not considered as a person. However, each individual who shared in the proceeds derived from such a joint farming operation could be considered a separate person and be listed on program documents as a producer for payment purposes. 7 C.F.R. Sec. 795.6.[15] The payment limitation provisions also included a catchall clause which stated:
 
 
 28
 "All or any part of the payments otherwise due a person under the upland cotton, wheat, and feed grain programs on all farms in which he has an interest may be withheld or required to be refunded if he adopts or participates in adopting any scheme or device designed to evade or which has the effect of evading the rules of this part. Such acts shall include but are not limited to concealing from the county committee any information having a bearing on the application of the rules in this part or submitting false information to the county committee (for example, if side agreements are entered into which differ from information furnished to the county committee concerning the manner in which program payments are actually shared or the actual facts of a sale or other transfer of property) or creating fictitious entities for the purpose of concealing the interest of a person in a farming operation." 7 C.F.R. Sec. 795.16.
 
 
 29
 Section 795.19 provides that if two or more persons or entities, which are entitled under the regulations to be treated as only one person, receive payments under the program exceeding the one person limitation, all are jointly and severally liable "for any liability arising therefrom."
 
 
 30
 A catchall clause similar to section 795.16, which pertained to payment limitations, existed to govern the regulations as a whole. This was section 722.817, which stated:
 
 
 31
 "(a) A producer who is determined by the county committee or the State committee to have erroneously represented any fact affecting a program determination shall not be entitled to payments under the program for the farm with respect to which the representation was made and shall refund to the Commodity Credit Corporation the payments received by him with respect to such farm.
 
 
 32
 "(b) A producer who is determined by the State committee, or the county committee with the approval of the State committee, to have knowingly (1) adopted any scheme or device which tends to defeat the purpose of the program, (2) made any fraudulent representation, or (3) misrepresented any fact affecting a program determination shall not be entitled to payments for any farm under the program and shall refund to the Commodity Credit Corporation all payments received by him with respect to the program." 7 C.F.R. Sec. 722.817.
 
 
 33
 B. THE ASCS PROCEEDINGS AND DETERMINATIONS.
 
 
 34
 In the early spring of 1973 the USDA began to investigate the operation of the Upland Cotton Price Support Program in Gaines County, Texas.[16] Allotment transfers and 1972 payments in that county had been extremely high, about five times higher than in other counties, and the USDA suspected that allotments were being manipulated in the manner described above to increase payments in violation of program regulations. The Executive Director of the Texas ASCS Committee requested that the Office of the Inspector General within the USDA inspect the situation in Gaines County. The Inspector General issued a formal report on August 1, 1973, and a supplemental report some time later. Based on these reports, E.J. Person, Deputy Administrator of the ASCS, suspended the Gaines County ASCS Committee and sent Clifton Adams, then Acting Assistant to the ASCS Deputy Administrator, from Washington to assume the County Committee's functions, to make a further investigation, and to take any necessary corrective action. On November 27 and 28, 1973, while en route to Gaines County, Adams met with the ASCS State Executive Committee to discuss the situation there and to inform them of the role he was to play. Adams assumed the functions of the suspended Gaines County Committee and on December 6, 1973 made determinations that the appellees had violated, among other regulations, the section 722.817(b) "scheme or device" proscription and were thus liable for a refund of their 1973, and in some cases 1972, payments.
 
 
 35
 With variations, the alleged schemes found by Adams were ones in which producers or operators had created and then exploited the difference between the low transfer and the high payment yield of a small cotton allotment. Not all of the individuals found liable for 1972 or 1973 payments, however, were actually involved in the selection of the proper parcels and their reconstitution. In several cases, they (1) leased parts of such farms because of the high program payments these tracts would command; (2) were only "straw" tenants, not actually farming the land but enabling the farm operator to evade the $55,000 program limitation; or (3) were not actually separate "persons" entitled to payments within the regulations. They were found liable under either or both of the two "scheme or device" regulations, section 722.817 and section 795.16. In accordance with the governing appeal regulations, Adams, still acting in lieu of the County Committee, held informal hearings to reconsider his determinations, as required by these provisions. He affirmed his initial decisions with respect to each of the appellees, who then took appeals to the State Committee and to the ASCS Deputy Administrator in Washington, at each of which levels the appeals were also affirmed.
 
 
 36
 C. THE GOVERNMENT'S ENFORCEMENT ACTION.
 
 
 37
 In June and July 1979 the United States filed seven separate suits against the appellees to enforce these administrative determinations requiring the refund of payments made in 1973 and, in some cases, also 1972. Although recitation of the government allegations in each is lengthy and tedious, the variation in each of these suits requires that we set out the various claims made by the government in its complaints.
 
 
 38
 1. Facts of the Individual Cases.
 
 
 39
 a. Batson, et al.
 
 
 40
 The first of the government's suits consolidated in this appeal is against Glynn Batson, South Plains Land Corporation ("SPLC"), and Johnny Lemmons (Appeal No. 81-1242). In count one it seeks to hold these appellees jointly and severally liable for $532,992.11 paid to the producers of six farms (Farms F-110, F-480, C-263, A-263, A-285, and A-286) in 1972 and 1973. Its claim is based on the determination made by Clifton Adams, and affirmed by the ASCS at the state and national levels, that the appellees knowingly adopted a scheme or device to defeat the purpose of the 1972 and 1973 upland cotton programs in violation of section 722.817. Because of this scheme the government asserted that the appellees are liable to refund all program payments on these farms.
 
 
 41
 The scheme, as found in the final ASCS determination, was essentially as described above. Farm C-9003, owned by appellee Batson, provides an example of its operation in 1972. This farm consisted of 160 acres of cropland and 59.2 acres of upland cotton allotment. In 1971 Batson sold 55.2 acres of the cotton allotment and leased the remaining four acres to John H. Jones, who planted them in cotton. In the fall of 1971 Batson certified that this farm had produced 1,352 pounds of cotton per acre. The ASCS determination states that "[t]he certification was supported by gin tickets issued by Farmers Gin Company, which was also managed by Glynn Batson." The four acres of cotton allotment on Farm C-9003 had a 1972 "transfer" yield of 150 pounds per acre[17] (i.e., the average yield for the years 1968, 1969, and 1970), but with the purported production of 1,352 pounds per acre in 1971, its payment yield for 1972 became 540 pounds per acre (i.e., the average yield for the years 1969, 1970, and 1971).
 
 
 42
 Thus, Farm C-9003 now had four acres of cotton allotment with low transfer and high payment yields enabling a producer, through careful reconstitutions, to inflate 1972 subsidy payments. The first step was to add nonallotted cropland to the farm, which Batson did with 800 acres purchased or leased from appellee Johnny Lemmons. The additions came in the form of 320 acres from Farm C-239 and 480 acres from Farm F-110. The resulting combination of the three farms, now listed as Farm F-110, had 960 acres of cropland and four acres of cotton allotment. Batson and Lemmons then transferred 837.2 acres of upland cotton allotment to the new Farm F-110. The yields of these allotments are not stated in the ASCS determination so it is unclear to what degree the number of allotments was inflated in that transfer. In any event, however, the 837.2 acres transferred acquired the (presumably) higher payment yield of 540 pounds per acre of the receiving farm. Finally, Batson and Lemmons leased the 320 acres of the original Farm C-239 to J.R. Walker, and the 480-acre tract, which was formerly farmed as Farm F-110, to Dan Sanders. The ASCS determination states that J.R. Walker, who was not a party to any of these suits, received $22,962.24 in upland cotton payments and that SPLC, owned by Batson, received $45,179.96.
 
 
 43
 Batson and SPLC were determined to have put together another such scheme in 1972 involving Farms C-9004, A-286, and A-285, and in 1973 involving Farms D-2003 and D-342. The government also has other claims for payments made to Batson, SPLC, and Lemmons[18] in 1973, based on similar devices, as well as on claimed false reporting of farm production to increase the 1973 payment rate per acre and violation or evasion of the payment limitation regulations (part 795) and other specific regulatory prohibitions, including those denouncing reconstitutions to establish eligibility to transfer allotments subject to sale or lease (section 719.3) and those concerning proportionate allocation of allotments and related matters on farm division (section 719.8).[19]
 
 
 44
 b. Leverett, et al.
 
 
 45
 The second government suit is against Dale, Cletus, and Wayne Leverett (Appeal No. 81-1243). It is grounded on violation of the $55,000 per person payment limitation and the provisions of section 795.3. Based on ASCS determinations affirmed on administrative appeal, it claims that in 1972 Dale and Cletus Leverett did not qualify as separate persons under section 795.3 (and section 795.15, relating to custom farming) and were thus jointly and severally liable for the refund of $47,222.88 in payments made to them in 1972 in excess of the $55,000 payment limitation; and that in 1973 Dale and Wayne Leverett were not separate persons under section 795.3 and were thus jointly and severally liable for refund of $47,916.39, the amount of the payment to them in 1973 in excess of $55,000. The ASCS letter of determination in their case concluded with respect to the 1972 payments that:
 
 
 46
 "The records indicate that Dale Leverett, the son of Cletus Leverett, actually negotiated the lease and farmed the land [937.5 acres from Farm A-286 as Farm A-285] using Cletus Leverett's name in order to circumvent the $55,000 payment limitation since Dale Leverett was farming other tracts of land."
 
 
 47
 With respect to the 1973 payments, the ASCS letter made a similar determination:
 
 
 48
 "Dale Leverett and Glynn Batson negotiated a similar arrangement in 1973 for the 937.5 acres of land indicating that Dale Leverett's brother, Wayne Leverett, was the producer on this tract. The records further indicate that Wayne Leverett merely signed his name to the farm records but that Dale Leverett actually operated the farm."
 
 
 49
 The ASCS determination concluded "that Dale Leverett and Cletus Leverett are one person for 1972 payment limitation purposes and that Dale Leverett and Wayne Leverett are one person for 1973 payment limitation purposes."
 
 
 50
 c. Prather.
 
 
 51
 The government's third suit is against Lois Prather (Appeal No. 81-1244). Its complaint is grounded on section 795.3 (and section 795.15) and seeks $32,907.66 paid to her in 1973. From the final administrative determination on her case, however, it appears that she was actually determined to be jointly and severally liable along with SPLC for this amount which was paid to her respecting Farm A-263. The government's claim is based on the determination that Prather was not a "bona fide producer," apparently because the requirements of section 795.3, regarding separate persons, were not met. Farm A-263, created after various combinations, had a cotton allotment of 1,116 acres and commanded $115,000 in 1973 program payments for all of its producers. With respect to this farm, Prather's final ASCS determination stated that:
 
 
 52
 "Batson purported to lease 640 acres of farm A-263 to Lois Prather, his mother-in-law, who had no equipment to farm the land, paid no monies for the lease, and contributed no capital to the farming operation. The lease was a scheme by Glynn Batson to evade the payment limitation."
 
 And that:
 
 53
 "We find that Glynn Batson was the sole contributor to the capital assets of South Plains Land Corporation which was established as 50 percent owned by Lois Prather, his mother-in-law, 46 2/3 percent owned by himself and 3 1/3 percent owned by his wife. Therefore, Glynn Batson, South Plains Land Corporation, and Lois Prather are considered one person for payment limitation purposes."
 
 
 54
 d. T.A. Wartes, et al.
 
 
 55
 The government's fourth suit is against T.A. Wartes, Wayne Hicks, Bill Wartes, and Gene Irwin (Appeal No. 81-1245). Based on a final ASCS determination, it seeks a refund of 1973 payments of $72,797.40 from these appellees, jointly and severally, for a violation of section 722.817. The "scheme" found was similar to the one alleged in the Batson case. The ASCS determination found that:
 
 
 56
 "[I]n March of 1973, Mr. T.A. Wartes purchased from John Thomas, doing business as Jon T. Farms, farm F-470, consisting of 80 acres of cropland and 77 acres of cotton allotment[.] [T]he farm had a favorable yield of 140 pounds for intertransfer and 680-pound payment yield per acre for 1973."
 
 
 57
 This favorable combination of yields was generated out of a .8-acre allotment planted by Charles Medlin in 1972 which had a transfer yield of 140 pounds per acre and, based on the purported 1972 yield of 1,780 pounds per acre, a payment yield of 680 pounds per acre. Medlin purchased nonallotted cropland and allotments to create a new farm with 1,500 acres of cropland and 1,447.3 acres of cotton allotment all bestowed with transfer and payment yields of 140 and 680 pounds per acre, respectively. Parcels from this farm were then transferred to others and, as stated, T.A. Wartes bought 77 acres of its cotton allotment.
 
 
 58
 T.A. Wartes then himself utilized the favorable yields of this tract by adding 960 acres of his cropland and 636.7 acres of leased cotton allotment, giving his farm, F-470, a total of 1,040 acres of cropland and 713.7 acres of allotment. The ASCS determination explains T.A. Wartes' motive for combining his 960 acres of cropland and leased allotments with Farm F-470, as opposed to combining it with another tract he had which was also eligible to receive allotments:
 
 
 59
 "According to the records, Mr. Wartes had other land in Andrews County which could have been combined with this 960 acres of land and which would have qualified the acreage for cotton allotment. The payments would have been less favorable were the reasons [sic ] for the transfer of the land to Gaines County to be combined with farm F-470. The 1973 payments on the 89,140 pounds of cotton transferred at $0.15 per pound would have been $13,371; however, the payments after the combination of F-470 (636.7 X 680 X $0.15) amounted to $64,943.40 for a farm payment of $72,797.40."
 
 
 60
 It was also determined that this reconstitution was improper because the farms were not operated as a unit, as required by the regulations. The other appellees, Bill Wartes and Gene Irwin, were apparently held liable as owners of Farm F-470 with T.A. Wartes. Wayne Hicks was liable because his 33.75 percent share of program payments from Farm F-470 was not proportional to his 25 percent interest in the crop based on his contribution of the labor for the operation. 7 C.F.R. Sec. 795.6.
 
 
 61
 e. A. Earl Jones, et al.
 
 
 62
 The government's fifth suit is against eighteen individuals comprising two joint ventures (Appeal No. 81-1246). In 1973 six of these appellees were members of the Gaines County Farms Joint Venture, which leased part of Farm D-362. It was purportedly custom farmed by C.R. Bruce for the joint venture. Each member gave A. Earl Jones power of attorney to act on his behalf with respect to filing for program payments. The government seeks to hold the members of the Gaines County Farms Joint Venture jointly and severally liable for $321,821, which is the sum of the individual payments of $53,653.50 made to each of its members. Its claim is based on the final ASCS determination that they had violated section 722.817 and the similar section 795.16, which prohibited any scheme or device to evade the payment limitation regulations of part 795, including sections 795.3 and 795.6.
 
 
 63
 In 1973 the remaining appellees (in Appeal No. 81-1246) were members of a second group called the GACO Joint Venture. It also leased part of Farm D-362, which was purportedly custom farmed by C.R. Bruce. As above, A. Earl Jones had power of attorney to act on behalf of each of the members. The government seeks to hold the members of the GACO Joint Venture jointly and severally liable for $697,495.50, which is the sum of the individual payments of $53,653.50 made to each of its members. This claim is also based on the final ASCS determination that members of this joint venture had violated section 722.817 and section 795.16.
 
 
 64
 The appellees in both of these groups were found to have violated section 795.16 because they were "not actively engaged in farming operations on the joint ventures' leased acreages." 7 C.F.R. Sec. 795.6. As a result, they "did not qualify as a separate person for limitation purposes (i.e., were not eligible for any program payments)." The members of these joint ventures had not themselves participated in the reconstitutions which gave Farm D-362 the inflated program payments; however, they were also determined to have been aware of them and to have entered into the joint ventures as an investment by which to reap the benefits of the artificially inflated payments.
 
 
 65
 f. Don H. Wilson, et al.
 
 
 66
 The government's sixth suit, grounded on violation of the payment limitations, is against fourteen individuals which it alleges purportedly leased a tract of farmland from Lonnie D. Clark and had custom farmed by C.R. Bruce (Appeal No. 81-1247). Each appointed Clark to act as his attorney for the purpose of filing for payments and each received 1973 payments in the amounts listed in the margin.[20] The government claims refund of these amounts based on the final ASCS determination that these appellees had violated section 795.16 and section 722.817(a) (denouncing misrepresentations).
 
 
 67
 The ASCS determination found that these leases were a scheme devised by Lonnie Clark and Clark Trusts to evade the payment limitation and to defeat the purpose of the program. The defendant-appellees were simply straw men who did not contribute any land, management, capital, or labor to the tracts on which they were purportedly producers, contrary to sections 795.3 and 795.16. Their purpose was simply to create eligibility for program payments while Lonnie Clark in fact handled the entire farming operation.
 
 
 68
 g. Earl Bowman, et al.
 
 
 69
 The government's seventh suit--the final one considered in this opinion--is against Earl Bowman, Ernest L. Bowman, J.E. Aldridge, Don Carmichael, and the estate of Everett M. Bowman (Appeal No. 81-1248). It claims refund of 1973 payments from Earl Bowman alone of $378,533.25 and from the remaining of these appellees jointly and severally of $209,631.71, based on a final ASCS determination that they had violated section 722.817 and section 795.16. Violation of section 719.3 is also charged.
 
 
 70
 The scheme allegedly worked in a fashion similar to those described above. Bowman purchased 79 acres of Farm E-9010 with a cotton allotment of 37.7 acres, a transfer yield of 270 pounds per acre, and a payment yield of 695 pounds per acre. Subsequently, Earl Bowman with Johnny Lemmons purchased and leased 3,133.6 acres of cotton allotment which became 3,544.1 acres of allotment when transferred to the new Farm F-256 and which assumed the favorable yields of Farm E-9010. This allotment was placed on 4,414 acres of cropland that Earl Bowman allegedly purchased to be operated as a single unit as Farm F-256 for 1973. The government claims, however, that this farm in reality was leased out to various producers to avoid the payment limitation. The nonallotment land would not have been eligible for payment had it not been combined with Farm F-256, nor could it have received the $378,533.25 in 1973 payments. The determination states, "If Earl Bowman had operated this entire farm as a single unit as he so certified to the Gaines County ASC committee the total payments would have been limited to $55,000 in 1973."
 
 
 71
 Among the producers to whom this land was leased was the Circle 7 Partnership, which included all of the appellees in this particular suit. The ASCS determined that the partnership was formed to evade the $55,000 payment limitation. Each of the five partners received $41,903.63 in 1973 payments; however, Bowman and Aldridge were the only partners involved in actually farming the land.
 
 
 72
 2. Proceedings in the District Court.
 
 
 73
 The appellees in these seven cases asserted several defenses to these government claims, including: the statute of limitations; the vagueness of section 722.817(b)(1); their reliance on government approval of their actions; and a host of grounds on which they claimed to have been denied due process in the administrative proceedings. Among the due process claims were (1) bias and prejudgment of Clifton Adams and the hearing officers on appeal; (2) denial of due process because of the delay in the proceedings; and (3) lack of procedural due process because of the government's failure to give notice of its initial determination, its denial of discovery, its refusal to compel the attendance of certain witnesses, and its refusal to allow appellees to cross-examine the investigators responsible for certain reports relied upon by the government in its administrative determinations.
 
 
 74
 The government responded to appellees' contention that they had been denied the right to cross-examination of certain witnesses by requesting that the cases be remanded to the ASCS in Washington for a determination of whether appellees had in fact "made specific requests for identified witnesses in order to qualify for a remand hearing." If appellees had made such requests, a remand hearing would be held; if not, the cases would return to the district court. The government and the appellees also filed cross-motions for summary judgment, and on February 17, 1981, a hearing was held in the district court on both the summary judgment motions and the government's motion for remand.
 
 
 75
 On April 3, 1981 the district court granted summary judgment to the appellees in each suit. It held that the government's suits were barred by the applicable six year statute of limitations and, alternatively, that section 722.817(b)(1), one of the regulations under which the government sought recovery in several of the suits, was unconstitutionally vague and, therefore, invalid. The district court did not reach any of the other issues in these cases.
 
 II.
 THE LAW
 
 76
 A. THE STATUTE OF LIMITATIONS.
 
 
 77
 The first issue presented to us on appeal is whether the district court correctly held that the government's claim was barred by the applicable statute of limitations, 15 U.S.C. Sec. 714b(c),[21] which was six years. Set out in the margin is a chart showing when payments were issued to the appellees and when the government's suits were filed.[22] The district court determined that the government's cause of action for refund of 1973 payments in these suits accrued when the "reconstitutions" involved in the alleged schemes were completed in May 1973, more than six years before the filing of the complaints, which occurred on June 4, and July 3 and 12, 1979.
 
 
 78
 We disagree with the district court's determination of when the government's cause of action accrued, and reverse its holding. The Supreme Court stated in United States v. Lindsay, 346 U.S. 568, 569, 74 S.Ct. 287, 288, 98 L.Ed. 300, 304 (1954), that "[i]n common parlance a right accrues when it comes into existence ...." To give specific meaning to this general proposition, we must determine what "right" is the basis of the government's claim and then when it came into existence.
 
 
 79
 The government's "right" in this instance is essentially founded on the two "scheme or device" provisions in the ASCS regulations, section 795.16 and section 722.817(b). The former states that "[a]ll or any part of the payments otherwise due a person ... may be withheld or required to be refunded if he adopts or participates in adopting any scheme or device ..." to evade the payment limitation. 7 C.F.R. Sec. 795.16. The latter states that "[a] producer who is determined ... to have knowingly (1) adopted any scheme or device which tends to defeat the purpose of the program ... shall refund to the Commodity Credit Corporation all payments received by him with respect to the program." 7 C.F.R. Sec. 722.817(b).
 
 
 80
 The government's right under these provisions, the right which it here seeks to enforce, is to a refund of payments made to the producer but to which the producer is not entitled. The provisions do not impose a criminal or civil penalty for actions of producers taken prior to the payment. The right to a refund cannot exist until a payment is made, and only at that time does it "come into existence."
 
 
 81
 The Supreme Court's decision in United States v. Wurts, 303 U.S. 414, 58 S.Ct. 637, 82 L.Ed. 932 (1938), which involved a similar problem, supports this interpretation. The question there was whether the statute of limitations, requiring the United States to bring an action to recover erroneous tax refunds "within two years after the making of such refund," began to run when the payment was allowed or when it was actually made.[23] The government had brought suit within two years of the payment of the refund but more than two years after the Commissioner of the IRS had "allowed" the refund by signing the schedule of overassessments.
 
 
 82
 The Court stated that "[o]bviously, the Government had no right to sue this taxpayer to recover money before the money had been paid to him. The construction urged by respondent would allow the statute of limitations to begin to run against recovery on an erroneous payment before any such payment is made." Id. at 418, 58 S.Ct. at 639, 82 L.Ed. at 935.
 
 
 83
 The facts of the case before us are analogous. The government made payments which were allegedly erroneous because the appellees had not satisfied all of the requirements of the program, and it then became entitled to a refund under the terms of the program regulations. The construction of 15 U.S.C. Sec. 714b(c) adopted below by the district court, like the one rejected in Wurts, "would allow the statute of limitations to begin to run against recovery on an erroneous payment before any such payment is made."
 
 
 84
 The reasoning in the district court's opinion and the additional arguments offered by appellees are not persuasive of a contrary result. In its opinion the district court relied upon two cases, United States v. Templeton, 199 F.Supp. 179 (E.D.Tenn.1961), and United States v. Rolenc, 345 F.Supp. 1260 (D.Neb.1972).
 
 
 85
 In Templeton, the defendant made false representations to the CCC in order to procure a loan secured by a pledge of his cotton. Although the loan was generally without personal liability, the promissory note signed by the defendant expressly provided that if there were fraud or false representations in the making of the note, then the maker would be and remain personally liable for payment of the loan. The applicable statute of limitations was the same as here, six years, as set forth in 15 U.S.C. Sec. 714b(c). The government, however, brought suit on the note more than six years after it was signed and the loan proceeds disbursed, after the due date of the note, and after the government had knowledge of the fraud. The government argued that the six year statute should begin to run at the time the government realized its loss, which had occurred within six years of the filing of the suit when the government sold the cotton securing the loan and the sales proceeds proved insufficient to cover the debt. The Templeton court rejected the government's theory, holding that the statute began to run at one of the three other possible times: when the note was made and the loan disbursed, the due date, or when the fraud was discovered. But the court refused to decide among these alternatives since all occurred more than six years before the suit was filed. The court noted the "fact that the Government may not have ascertained its loss at the time when its right of action accrued is a matter within its control and is a practical difficulty which cannot alter the fact that the right of action did accrue at that time." Id. at 185.
 
 
 86
 The circumstances which prompted the Templeton court to make this statement are not present here. This case is not one, as the court below asserts, in which the government failed to discover a loss within the six year limitations period. Here, no loss was present to be either discovered or recovered until the cotton subsidies were paid, and the government's suit was brought within six years of that time.
 
 
 87
 Nor does United States v. Rolenc support the district court on this issue. Like Templeton, Rolenc involved a borrower from the CCC who made fraudulent representations in order to secure a crop loan. The six year, section 714b(c), statute of limitations was applicable. The court stated specifically that the government's suit against the defendant Rolenc was "not an action on the loan. Rolenc's default is not the basis of the action; the right to sue under [6 C.F.R. Sec. 421.4016] would exist whether the loan was repaid or the pledged grain forfeited." 345 F.Supp. at 1262. The Rolenc court characterized the suit before it as one based on fraud.[24] The fraudulent representations were made and the loan was disbursed in 1960. At the loan's extended maturity on July 31, 1964, the defendant tendered the pledged crop in satisfaction of the loan, as borrowers under the program were entitled to do, even though its market value was less than the loan balance. The fraud was actually discovered in 1966, though the government could reasonably have known of it in 1960. Suit, for an amount equal to the remaining loan balance, was filed July 15, 1970, which would have been within the six year limitations period if the cause of action accrued at or after the loan's maturity. The court, however, held that the cause of action accrued in 1960, when the representations were made (and could reasonably have been discovered) and the loan disbursed, and that hence the suit was barred. In Rolenc, then, the defendant received in 1960 loan proceeds to which he was not entitled, and he could have been sued in 1960 for refund of the sums which had been erroneously so disbursed to him. Rolenc is not authority for the proposition that a cause of action for refund of sums wrongfully disbursed accrues prior to the disbursement.
 
 
 88
 In both Templeton and Rolenc the disbursement was wrongful when made, as it was procured by fraud; and the defendant received it, and a cause of action in favor of the government arose for its recapture, without the period of limitations. Here, by contrast, the 1973 disbursements sought to be recaptured were made within the period of limitations.
 
 
 89
 United States v. Withrow, 593 F.2d 802 (7th Cir.1979), cited by appellees in their briefs, likewise does not support the district court. In Withrow, a government intermediary made interim payments to providers of health care under the Medicare Program, based on their estimated cost of services provided. Any overpayments or underpayments were to be corrected following an audit in which the provider was required to prove its actual costs. In a government suit to recover an overpayment, the Court held that the limitations period on the action began to run at the time of the audit. Only then did the government have any right to claim a refund. Likewise, in the present case there was no liability for refund on which a suit could be brought until the government had made program payments.
 
 
 90
 Accordingly, we hold in each case that the government's cause of action for refund of the 1973 payments is not barred by limitations and that the district court erred in holding to the contrary.[25]
 
 
 91
 However, the situation is obviously different with respect to the 1972 payments. As to each of these payments, suit was instituted more than six years after the payment was made. Clearly, the applicable statute of limitations is section 714b(c), as the district court found. See note 21, supra. The government's complaint in each suit is expressly based on section 714b(c), and, though its position below vacillated somewhat, before this Court it has steadfastly maintained that the limitations period for these suits is governed by section 714b(c).[26] The government argues, however, that it did not become aware of the relevant facts until August 1, 1973, and that limitations was hence tolled until then by the terms of 28 U.S.C. Sec. 2416, which provides:
 
 
 92
 "For the purpose of computing the limitations periods established in section 2415, there shall be excluded all periods during which--
 
 
 93
 "....
 
 
 94
 "(c) facts material to the right of action are not known and reasonably could not be known by an official of the United States charged with the responsibility to act in the circumstances; ..."
 
 
 95
 We reject this contention for several reasons. To begin with, it was not urged by the government below. So far as we can determine, before the district court the only ground urged by the government to support its contention that the suits were not time barred as to the 1972 payments was that the final administrative determinations respecting those payments were made within one year of suit, and hence they were within the provision of 28 U.S.C. Sec. 2415(a) allowing suit "within six years after the right of action accrues or within one year after final decisions have been rendered in applicable administrative proceedings required by contract or by law, whichever is later."[27] However, as the government now recognizes, section 2415(a) does not apply, as its terms except cases "otherwise provided by Congress," which exclusion plainly embraces section 714b(c), the here applicable limitations statute. See note 26 and accompanying text, supra. See also note 29, infra, and accompanying text.
 
 
 96
 In the second place, it is evident from the above-quoted text of section 2416 that its tolling provisions apply only to cases covered by section 2415, and, as noted, the cases before us are concededly governed by section 714b(c). The government argues, however, that we should apply section 2416 to section 714b(c) because the amendment to the latter section, increasing its limitations period from four to six years, was adopted with the purpose of bringing the section 714b(c) limitations period in line with that of other federal limitations statutes, directing our attention to the House Committee report on the amendatory act. However, this report, partially set out in the margin,[28] says nothing about tolling (other than for counterclaims), and the desired uniformity which it references is that for the period of limitations in suits against the United States. Section 714b(c) has its own tolling provision respecting such suits (see note 21, supra ), while section 2416 is concerned with tolling suits by the United States. Moreover, this amendment to section 714b(c) was passed in 1949, while section 2416 was not enacted until 1966. Not only does the text of section 2416 reflect that it applies only to suits governed by section 2415, but the legislative history of P.L. 89-505, which promulgated both sections 2415 and 2416, clearly shows that such enactment was not intended to apply to other limitations statutes.[29] Accordingly, the government cannot avail itself of section 2416.[30]
 
 
 97
 It is, of course, the general rule, broadly stated, that in an action for fraud, or where there is fraudulent concealment, limitations does not begin to run, or is tolled, until the fraud is discovered or the plaintiff is put on inquiry that it has a potential claim. See United Klans of America v. McGovern, 621 F.2d 152 (5th Cir.1980). We assume, but do not decide, that this rule applies to section 714b(c). Compare United States v. Dawes, 151 F.2d 639, 643 (7th Cir.1945), cert. denied, 327 U.S. 788, 66 S.Ct. 808, 90 L.Ed. 1015 (1946) (fraud tolling does not apply to False Claims Act limitations, 31 U.S.C. Sec. 235), and United States v. Borin, 209 F.2d 145, 147-48 (5th Cir.), cert. denied, 348 U.S. 821, 75 S.Ct. 33, 99 L.Ed. 647 (1954) (same), with General Electric Company v. City of San Antonio, 334 F.2d 480, 483-85 (5th Cir.1964) (fraud tolling does apply to Clayton Act limitations, 15 U.S.C. Sec. 15b; Borin limited). However, as we have observed, this is not an action for fraud. See note 24, supra. This is not merely a matter of nomenclature. The government's cause of action in each case is expressly pleaded as one to enforce the administrative determination that the refunds are due.[31] Copies of the administrative determinations are attached to the complaints, and it is alleged that "[u]nder 7 U.S.C. Sec. 1385 and 7 C.F.R. Sec. 780.9, the determination ... is final and conclusive." As set out earlier in this opinion, section 1385 makes the administrative determinations of "facts constituting the basis for any ... payments under the cotton set-aside program ... final and conclusive ...." And, in its memorandum in opposition to the appellees' motions to dismiss and for summary judgment filed below, the government stated, "The claim for relief in these cases is enforcement of the administrative determinations which demand refund of program overpayments. The bases for those determinations are regulations which expressly provide for refund." On appeal, the government has informed us in its reply brief that "[t]he basis for these actions is the administrative determination of liability in each case." In the same brief it also states, "At no time has the United States alleged or attempted to prove fraud." Further, as we have observed, in the district court the government at no time attempted to rely on fraud or fraudulent (or other) concealment to defeat the plea of limitations as to the 1972 payments. See note 27, supra, and accompanying text.
 
 
 98
 Accordingly, we reject the government's contention that the district court erred in holding that the actions to recover the 1972 payments were barred by limitations.[32]
 
 
 99
 B. VAGUENESS.
 
 
 100
 The second issue presented is whether the district court correctly held that one of the regulations under which the government sought its refunds, 7 C.F.R. Sec. 722.817(b)(1), was unconstitutionally vague and, therefore, invalid. The court considered vague the phrase "scheme or device which tends to defeat the purpose of the program" because neither "scheme or device" nor "purpose of the program" were defined in the statute or other regulations. As the district court's opinion stated:
 
 
 101
 "The Defendants fully complied with every requirement listed in the regulations, their actions were approved by the county committee as required in the regulations, and yet Defendants were still found to have adopted a scheme or device to violate the purpose of the program....
 
 
 102
 "Certainly a man of ordinary intelligence would not glean from the language of the regulation what acts would be considered wrongful or defeat the unknown purpose of the program.... [T]he government complains about the final effect of the reconstitutions and transfers, and not about the Defendants' actions which were completely legitimate under the regulations. Thus, it is difficult to ascertain how a regulation which uses undefined terminology and which fails to apprise a defendant of how the regulation will be applied can pass constitutional muster. See discussion Ryder Truck Lines, Inc. v. Brennan, 497 F.2d 230 (5th Cir.1974). The Court concludes that the regulation is unconstitutional due to vagueness.[33]
 
 
 103
 We cannot agree with the conclusion that section 722.817(b)(1) is so vague and overbroad as to be unconstitutional as a standard for determining that one was ineligible to receive and is hence required to refund price support payments obtained under this program, at least where, as here, there is no suggestion that it was applied on the basis of improper, ulterior or invidiously discriminatory considerations.
 
 
 104
 We admit to some concern respecting the considerable generality and imprecision of the regulation's language, "have knowingly ... adopted any scheme or device which tends to defeat the purpose of the program," particularly in light of the absence of a comprehensive and relevantly detailed explicit definition of the program's purpose. Yet, in determining whether such generality and imprecision is constitutionally offensive, we must consider the character of activity with which the regulation deals, and the consequences attached to "violations" of the proscriptions. The character of conduct regulated is purely economic activity; activity which, moreover, attempts to avail itself of special governmental subsidies. First Amendment, privacy, and similar constitutional concerns are in no way implicated. The regulation is to be judged by its application to the character of conduct at hand, not to marginal cases where serious doubts might arise. Nor are penalties, penal or civil, imposed for "violations." Section 722.817(b) does not subject its "violator" to damages. Such a "violator" is, rather, denied a special governmental economic subsidy because it is determined that the economic activity in which he engaged is outside the purpose of the particular subsidy program. No charge of discriminatory or arbitrary application, on the basis of political, social, personal, or other bias or ulterior consideration, is here involved. Finally, the vice inherent in the generality and imprecision of the proscription is mitigated by the fact that appellees were determined to have acted "knowingly."[34]
 
 
 105
 Accordingly, our evaluation of the extent of the vagueness and breadth of this regulation, and our holding that it is not so vague or overbroad as to be constitutionally infirm, is informed by the foregoing considerations. That these considerations are properly taken into account in a case such as this clearly appears from Village of Hoffman Estates v. Flipside, Hoffman Estates, 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982), where the Court stated:
 
 
 106
 "In a facial challenge to the overbreadth and vagueness of a law, a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct. If it does not, then the overbreadth challenge must fail. The court should then examine the facial vagueness challenge and, assuming the enactment implicates no constitutionally protected conduct, should uphold the challenge only if the enactment is impermissibly vague in all of its applications. [Id. at 494-95, 102 S.Ct. at 1191; footnotes omitted.]
 
 
 107
 "....
 
 
 108
 "These standards [for evaluating vagueness] should not, of course, be mechanically applied. The degree of vagueness that the Constitution tolerates--as well as the relative importance of fair notice and fair enforcement--depend in part on the nature of the enactment. Thus, economic regulation is subject to a less strict vagueness test .... [Id. at 498, 102 S.Ct. at 1193.]
 
 
 109
 "....
 
 
 110
 "The Court has also expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe. And the Court has recognized that a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed.
 
 
 111
 "Finally, perhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights. If, for example, the law interferes with the right of free speech or of association, a more stringent vagueness test should apply." [Id. 455 U.S. at 498-99, 102 S.Ct. at 1193-1194; footnotes omitted.]
 
 
 112
 Similarly in Brennan v. Occupational Safety & Health Review Commission, 505 F.2d 869 (10th Cir.1974), the Court stated:
 
 
 113
 "A statute which is so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates due process. Connally v. General Construction Co., 269 U.S. 385, 391, 46 S.Ct. 126 , 70 L.Ed. 322. This rule applies to regulations. See Boyce Motor Lines, Inc. v. United States, 342 U.S. 337, 72 S.Ct. 329, 96 L.Ed. 367....
 
 
 114
 "We are considering a regulation promulgated pursuant to remedial civil legislation [an OSHA safety standard], Ryder Truck Lines, Inc. v. Brennan, 5 Cir., 497 F.2d 230, 233, and must do so 'in the light of the conduct to which it is applied.' United States v. National Dairy Corp., 372 U.S. 29, 36, 83 S.Ct. 594, 600, 9 L.Ed.2d 561. The question is whether the regulation 'delineates its reach in words of common understanding.' Cameron v. Johnson, 390 U.S. 611, 616, 88 S.Ct. 1335, 1338, 20 L.Ed.2d 182. A permissible 'leeway' is allowed in the field of regulatory statutes governing business activities in narrow categories. Papachristou [City of Jacksonville], 405 U.S. at 162, 92 S.Ct. 839 [at 839, 31 L.Ed.2d 110]." Id. at 872.
 
 
 115
 Applying these principles, it is evident that section 722.817(b)(1) falls, in all respects, within those categories of enactment where the degree of vagueness tolerated by the Constitution is at its greatest, and we conclude that the section passes constitutional muster.[35] We begin by looking at its terms in the abstract, and then consider them in light of the general character of appellees' conduct, as charged by the government.
 
 
 116
 The first part of the language under attack in section 722.817(b)(1) is the term "scheme or device." Taken in context, these words are not offensively imprecise "when measured by common understanding and practices." United States v. Petrillo, 332 U.S. 1, 8, 67 S.Ct. 1538, 1542, 91 L.Ed. 1877 (1947). The Random House College Dictionary defines scheme as "1. a plan, design or program of action to be followed; project. 2. an underhand plot; intrigue ...." Similarly, device is defined as "a plan, scheme or trick for effecting a purpose." The words "scheme" and "device" have been used in the securities laws and have not been held unconstitutionally vague in that context. See Aaron v. SEC, 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980). The "scheme or device which tends to defeat the purpose of the program" language has also been in the upland cotton regulations since 1970 and in other similar agricultural programs as far back as 1957. See 7 C.F.R. Sec. 485.291 (1958 ed.); 7 C.F.R. Sec. 1101.1031 (1959 ed.) (similar language). See Boyce Motor Lines, Inc. v. United States, 342 U.S. 337, 341, 72 S.Ct. 329, 331, 96 L.Ed. 367 (1952).
 
 
 117
 The second aspect of the vagueness challenge to this regulation focuses on the term "purpose of the program." It is not expressly defined in either the statute or the regulations. This lack of explicit definition, however, does not of itself make the regulation impermissibly vague.
 
 
 118
 Examining the term "purpose of the program," we begin by looking at the purposes of the Agricultural Act of 1970 and thus of the upland cotton program which was established by it. The Senate Report on this legislation set forth its purposes in general terms:
 
 
 119
 "This bill is designed to assure consumers of abundant supplies of food and fiber at fair and reasonable prices. It would protect farm prices and income, provide for expanding markets at home and abroad, minimize Government costs, and provide administrative flexibility to assure workability of programs." S.Rep. No. 91-1154, 91st Cong., 2d Sess. (1970), U.S.Code Cong. & Admin.News 1970, p. 4788.
 
 
 120
 We rely on this statement not as giving appellees notice of the purposes of the upland cotton program, but simply as confirmation of what those purposes were, and as an aid in determining whether they, in fact, would have been reasonably apparent to the program participants.[36]
 
 
 121
 We do, however, charge participants in the upland cotton program with the basic knowledge of the subsidy, loan, set aside, reconstitution, and payment limitation regulations. To be eligible for payments, a producer had to file ASCS Form 516 (entitled "Intention to Participate and Payment Application") in which he agreed to comply with the program regulations. To receive payment, a producer also had to file ASCS Form 580 (entitled "Report of Acreage and Certification of Compliance"), certifying that he had satisfied the terms and conditions of the program and requesting payment. Since the appellees' submission of these forms to the ASCS County Committee certified their compliance with the regulations, we attribute to them knowledge of the basic operation of the upland cotton program.
 
 
 122
 Such knowledge, given the specific nature of the program regulations and their functions, is clearly a basis on which the more general purposes of the program could have been evidenced to the appellees. For example, the subsidy and loan programs by their very existence revealed the purpose of protecting farm prices and income. Likewise, the set aside requirements, adjusted from year to year, could easily have been recognized as having among their purposes the following stated in the Senate Report: to assure abundant supplies without production levels which would cause either shortages, with unreasonably high prices, or surpluses and unfairly low prices.
 
 
 123
 Finally, several of the regulations revealed the program's intent to minimize government costs. The Agricultural Adjustment Act of 1970 itself provided for a payment limitation of $55,000 per person under the program. This provision was implemented through a detailed set of regulations defining "person." These regulations were an obvious attempt to reduce government costs. The reconstitution regulations also adjusted allotment totals so that the pounds per acre on which yields were calculated would be roughly the same before and after a reconstitution. This adjustment was obviously designed to prevent total payments from significantly changing as a result of reconstitutions. Thus, they were a part of the overall plan to minimize costs through the payment limitations.
 
 
 124
 The calculation of different transfer and payment yields was used to permit reconstitutions for the next year to begin, without delay, before the current year's yield was determined. Its purpose was obvious from its function, and plainly did not include allowing program payments and costs to artificially multiply because of reconstitutions.
 
 
 125
 The overall, general purpose of the various payment limitations, the reconstitution regulations and the "transfer" and "payment" yield calculations, was reasonably clear. We conclude at the outset that the term "purpose of the program" is not devoid of any meaning and in this context is not unconstitutionally vague, per se, for its lack of explicit definition.
 
 
 126
 We now consider the general character of conduct in which appellees are alleged to have engaged and examine the phrase "scheme or device which tends to defeat the purpose of the program" in the light of this type of conduct.
 
 
 127
 In Batson, et al. (Appeal No. 81-1242), Batson allegedly used the extremely high 1972 yield figure of 1,125 pounds per acre in conjunction with various transfers and reconstitutions to inflate on paper his cotton allotments and their payment yields by the means described above. Batson's company, SPLC, and Johnny Lemmons were allegedly engaged in these manipulations with Batson.
 
 
 128
 This conduct was not haphazard or without motive. It was carefully thought out, planned, and executed. Under any reasonable construction of the purpose of the Upland Cotton Price Support Program, actions such as this would tend to defeat that purpose, which was not to make vastly inflated subsidy payments based on crop yields which had been manipulated and multiplied only on paper. We have no difficulty in concluding that a reasonable person would be able to understand that this character of conduct was a "scheme or device" which defeats the "purpose of the program," and that these terms are not themselves unconstitutionally vague as applied to conduct of this sort, especially in light of the "knowingly" determination. See Civil Service Commission v. National Association of Letter Carriers, 413 U.S. 548, 578-79, 93 S.Ct. 2880, 2897-2898, 37 L.Ed.2d 796 (1973).[37] Batson, et al. were also determined to have violated or evaded the payment limitation regulations and other specific regulatory prohibitions.
 
 
 129
 Relying on the same means used by Batson, the appellees in T.A. Wartes, et al. (Appeal No. 81-1245) also vastly inflated their program payments. T.A. Wartes may not have himself created the yields on the parcel which seeded his alleged scheme. However, by purchasing land with such yields and performing the necessary transfers, he and his co-appellees were able to inflate their program payments by roughly $50,000. Again, we do not hesitate to conclude that section 722.817(b)(1) is not unconstitutionally vague as applied to this character of conduct. Additionally, the Wartes, et al. case involves a reconstitution not operated as a unit as required and a violation of section 795.6.
 
 
 130
 The appellees in Earl Bowman, et al. (Appeal No. 81-1248), and those in A. Earl Jones, et al. (Appeal No. 81-1246), were found to have violated both section 722.817(b)(1) and section 795.16. The appellees in each of these cases, with the exception of two in the Earl Bowman, et al. case, allegedly took no active part in the farming of the land leased by the joint ventures and simply served as a vehicle for avoiding the $55,000 payment limitation. Again, we conclude that a reasonable person would be able to understand that this type of conduct was a scheme or device to undermine the cotton program and consider section 722.817(b)(1) constitutional, especially in light of the section 795.16 and "knowingly" determinations, as applied to such a situation.
 
 
 131
 Appellees contend that section 722.817(b)(1) may not constitutionally be applied to them because it is not claimed that they violated any of the other, more specific, statutory or regulatory prohibitions. In most instances, however, the conduct on the basis of which the refund is sought is also alleged to have violated section 795.16, denouncing schemes or devices to evade the $55,000 per person payment limitation and the various specific regulations (such as sections 795.3 and 795.6) implementing that limitation contained in part 795 of the regulations. Violations of other specific regulations were also charged, such as section 719.3, proscribing reconstitutions with the primary purpose of establishing eligibility to transfer allotments subject to sale or lease, and section 719.8, dealing with proportionate allocation of allotments and related matters when tracts are separated from a parent farm. No challenge is made, nor is any basis for valid challenge apparent, respecting the validity, on vagueness or related grounds, of these regulations. The "purpose of the program," within the meaning of section 722.817(b)(1), obviously includes compliance with the other specific program regulatory limitations, and a scheme or device to evade such limitations is plainly within the general language of section 722.817(b)(1).
 
 
 132
 So far as we have been able to determine, the only instances in which some specific regulation other than section 722.817(b)(1) is not involved are those where reconstitutions were carefully planned to interact with payment and transfer yield differentials to achieve an artificially vastly increased allotment that bore no reasonable relation to actual yields or to the total to which all the tracts involved would have been entitled separately considered. Obviously, such a result is not in keeping with the purpose of the program. Plainly it frustrates the evident intent of the reconstitution and adjustment regulations to prevent total payments from automatically vastly increasing or decreasing merely as a result of a reconstitution as such. And, a reasonable person could easily understand that the program could not possibly continue if such practices were to become the norm, that no principled basis existed on which to restrict entitlement to engage in such manipulations to appellees as opposed to most other program participants, and that the program did not contemplate or intend such practices. That is the functional equivalent of understanding that the manipulations amounted to a "scheme or device which tends to defeat the purpose of the program." Moreover, appellees do not dispute that it was found, in accordance with section 722.817(b), that they acted "knowingly," in other words, that they knew their scheme or device tended to defeat the purpose of the program. This being the case, they are not in a position to complain of possible vagueness in the "purpose of the program" concept in other contexts. That the particular manipulatory device considered here is not specifically denounced is not, in our view, controlling. In regulation of a complex program such as this, there is an obvious need for a "catchall" provision such as section 722.817(b)(1). Such provisions have been approved in other cases. See Arnett v. Kennedy, 416 U.S. 134, 161, 94 S.Ct. 1633, 1647, 40 L.Ed.2d 15 (1974).[38] As noted by the Supreme Court in Boyce Motor Lines, Inc. v. United States, 342 U.S. 337, 340, 72 S.Ct. 329, 330, 96 L.Ed. 367 (1952), "most statutes must deal with untold and unforeseen variations in factual situations, and the practical necessities of discharging the business of government inevitably limit the specificity with which legislators can spell out prohibitions."
 
 
 133
 Accordingly, we reject appellees' contentions that section 722.817(b)(1) is unconstitutionally vague and overbroad.[39]
 
 III.
 ISSUES ON REMAND
 
 134
 The only issues passed upon by the district court were the statute of limitations and the constitutionality of section 722.817(b)(1), each of which we have resolved above. A number of other issues remain in these cases, however, including appellees' claims of denial of due process in the administrative proceedings. None of these issues have been addressed by the district court. The resolution of some of them may moot others. Because of this, and the diversity and complexity of these cases, and in at least a number of instances the apparent paucity of relevant factual background in the records before us, we believe these issues should be addressed in the first instance by the district court on remand.[40] We intimate no view as to their merits, nor as to whether their resolution may be properly accomplished by summary judgment, conventional trial on the merits, or administrative remand (as the government suggested below in reference to the due process claims). We will, however, briefly comment on one issue which is likely to arise on remand, and may be of fundamental importance, in two of these suits.
 
 
 135
 Against at least one of the appellees in each of the suits against Batson, et al. (Appeal No. 81-1242) and Earl Bowman, et al. (Appeal No. 81-1248), the government seeks a refund of payments from individuals who were not the actual payees or direct recipients of the upland cotton payments in question. Rather, the government alleges that they received the money indirectly in the form of lease payments. See Baldridge v. Hadley, 491 F.2d 859, 864-65 (10th Cir.), cert. denied, 417 U.S. 910, 94 S.Ct. 2608, 41 L.Ed.2d 214 (1974). In this regard, we note that a final ASCS factual determination that payments were received in this manner may not necessarily be entitled to the "conclusive" effect ASCS factual findings otherwise receive by virtue of 7 U.S.C. Sec. 1385. That provision, as quoted above, states:
 
 
 136
 "The facts constituting the basis for any ... payments under the cotton set-aside program ... when officially determined in conformity with the applicable regulations prescribed by the Secretary ... shall be final and conclusive and shall not be reviewable by any other officer or agency of the Government." 7 U.S.C. Sec. 1385.
 
 
 137
 These particular appellees apparently contend that they received no government payments. Whether they did or did not in fact receive such payments may require a de novo judicial determination. See Gross v. United States, 676 F.2d 295, 299 n. 9 (8th Cir.1982). This judicial inquiry is required to determine whether these appellees were properly subject to the authority of the ASCS compliance review process and thus to the application of section 1385. For the reasons stated, we decline to speculate on the line which divides facts which are entitled to the section 1385 "conclusive" effect, and those which should receive de novo judicial consideration. We leave that judgment initially to the district court on remand.[41]
 
 IV.
 CONCLUSION
 
 138
 In sum, we have held that section 722.817(b)(1) is not unconstitutionally vague or overbroad, and that the suits for refund of the 1973 payments, and the False Claims Act cause of action, are not barred by limitations, and that the district court erred in its holdings to the contrary. We have also held that the district court correctly determined that the suits for refund of the 1972 payments were barred by limitations. Accordingly, the judgments are reversed and these cases are remanded for dismissal of the 1972 refund claims and otherwise for further proceedings consistent with this opinion.
 
 
 139
 REVERSED AND REMANDED.
 
 
 
 [1]
 An article in the Agricultural Law Journal provides a helpful overview of the function of these programs:
 "Price support and related operations have been carried out for specified commodities essential to the national welfare since 1933, beginning with programs under the Agricultural Adjustment Act. Federal laws have authorized price support purchase, loan, and payment programs; farm income protection programs; production adjustment programs; and marketing control programs.
 "The Agricultural Act of 1949 provides authority for price support and related programs for wheat, feed grains, (corn, grain sorghum, barley, oats, and rye), milk, soybeans, cotton, peanuts, rice, tobacco, wool, mohair, and honey....
 "....
 "The programs are funded by the Commodity Credit Corporation and carried out by the Agricultural Stabilization and Conservation Service (through its state and county offices) and the state and county agricultural stabilization and conservation committees. It should be pointed out that the Agricultural Stabilization and Conservation Service operates a number of programs for farmers other than the price support and income protection programs....
 "Price support is achieved (1) through loans on, and purchases of, commodities at announced or guaranteed levels, and (2) indirectly through adjusting production so that a balance between supply and demand is maintained.
 "With respect to wheat, feed grains, upland cotton, and rice, loans and purchases have, over the years, remained key components of the price support operation. However, in the 1970's, the federal programs moved away from adjusting production of these commodities through acreage allotment and marketing quota requirements under the Agricultural Adjustment Act of 1938 to an approach using voluntary set-asides under the Agricultural Act of 1949.
 "Under the set-aside approach, the Secretary of Agriculture determines, before the crops are planted, the production of wheat, feed grains, upland cotton, or rice that will be needed to meet domestic and export demand. If full production of the commodity would result in excessive supplies in relation to demand, the Secretary can announce a set-aside of acreage. Farmers who choose to participate in the program for that commodity for that year must set aside from production acreage equal to a specified percentage of their acreage devoted to the commodity. By meeting the set-aside requirement, the farmer becomes eligible for price support loans and purchases on all supported commodities, and for deficiency and disaster payments on the acreage on the farm planted to wheat, feed grains, upland cotton, or rice....
 "Producers of wheat, feed grains, upland cotton, and rice are also eligible for the deficiency payment program. Under this program, producers are provided income protection through direct payments. If the average market price for one of these commodities drops below a target level, deficiency payments will be made to participating producers of the commodity, equal to the difference between the target price and the higher of the price support loan level or average market price. Also, producers of these commodities may receive disaster payments in lieu of deficiency payments on that portion of their normal production that is not harvested due to (1) the farmer being prevented from planting the crop, or (2) reduced yields, caused by natural disasters or other conditions beyond the farmer's control." (Footnotes omitted.) Fraas, "Federal Assistance Programs for Farmers: An Outline for Lawyers." 1981-1982 Agri.L.J. 405, 432-34.
 This article also summarizes the role of the Commodity Credit Corporation:
 "The Commodity Credit Corporation is an agency and instrumentality of the United States within the Department of Agriculture, and its operations are subject to the supervision and control of the Secretary of Agriculture. The Commodity Credit Corporation also is a corporate entity and can engage in activities using the usual and customary channels, facilities, and arrangements of trade and commerce.
 "The Commodity Credit Corporation may sue and be sued, but no attachment, injunction, garnishment, or similar process may be issued against the Corporation or its property. Jurisdiction over such suits lies with the federal courts exclusively. State and local regulatory laws or rules will not apply to CCC contracts to the extent that the contracts exclude the applicability of such laws or rules, or to the extent that such laws or rules are inconsistent with the contracts.
 "The Commodity Credit Corporation is authorized to use its general corporate powers to support agricultural prices through loans, purchases, payments, and other operations, and remove and dispose of surplus supplies of agricultural commodities. The Secretary of Agriculture is directed to provide price support under the Agricultural Act of 1949 through the Commodity Credit Corporation." Id. at 435 (footnotes omitted).
 
 
 [2]
 A cotton allotment is an entitlement to grow a certain amount of cotton. If all conditions of the cotton program governing that allotment are met, it can become eligible for certain benefits, such as loans and subsidy payments
 
 
 [3]
 With respect to the determination of the average yield, section 1444(e)(3) states:
 "The average yield for the farm for any year shall be determined on the basis of the actual yields per harvested acre for the three preceding years, except that the 1970 farm projected yield shall be substituted in lieu of the actual yields for the years 1968 and 1969: Provided, That the actual yields shall be adjusted by the Secretary for abnormal yields in any year caused by drought, flood, or other natural disaster: Provided further, That the average yield established for the farm for any year shall not be less than the yield used in making payments for the preceding year if the total cotton production on the farm in such preceding year is not less than the yield used in making payments for the farm for such preceding year times the farm base acreage allotment for such preceding year (for the 1970 crop, the farm domestic allotment)."
 The statutory requirements for payment rates and the computation of yields appear in the regulations in 7 C.F.R. Sec. 722.808.
 
 
 [4]
 A "producer" did not have to perform the actual labor to be eligible for a subsidy. He could pay to have the work done for him by a custom farmer, who worked for hire on a unit of work basis, subject to certain restrictions. See 7 C.F.R. Sec. 795.15. The regulations provided these additional definitions: "Operator. Person who is in general control of the farming operations on the farm during the program year." 7 C.F.R. Sec. 719.2(o); "Owner. A person who has legal ownership of farmland, including a person who is buying farmland under a purchase agreement." 7 C.F.R. Sec. 719.2(p); and "Person. Individual, partnership, association, corporation, estate or trust, or other business enterprise or other legal entity and, whenever applicable, a State, a political subdivision of a State, or any agency thereof." 7 C.F.R. Sec. 719.2(q)
 
 
 [5]
 Although no citation appears following references in the government's briefs here to this Form 580 and we are unable to find a reference to it in the regulations, the appellees do not contest that it was required by the program
 
 
 [6]
 A farm was defined by the regulations as land under single operation, without regard to the location of the land. Thus, a farm could be "constituted" to include several separate and noncontiguous locations as long as it was operated by only one individual, partnership, corporation, or other entity permitted by the regulations
 
 
 [7]
 Section 722.420 sets out the "productivity adjustment" in the following terms:
 "(a) General. All or part of the upland cotton base acreage allotment established for a farm may be transferred to another farm.
 "(b) Productivity adjustments. For the purpose of the adjustments in this paragraph, the word 'yield' means that finally determined payment yield established for the farm for the year preceding the year the transfer is to take effect. The county committee shall determine the amount of base acreage allotment to be transferred by sale, lease, and by owner, where productivity adjustment is required under this paragraph as follows:
 "(1) Multiply the transferred acres by the payment yield for the transferring farm. The result is the number of pounds transferred.
 "(2) Divide the pounds transferred by the payment yield for the receiving farm. The result is the number of acres by which the allotment on the receiving farm is to be increased. The amount of base acreage allotment which may be transferred is limited to the cropland on the receiving farm less the receiving farm's current upland cotton allotment...."
 
 
 [8]
 A's five-acre increase in allotments is calculated as follows: 2,000 (number of pounds transferred from B) divided by 400 (pounds per acre yield of A) equals five
 Our illustrations all assume that the receiving farm (A or B, as the case may be) has, or timely acquires, sufficient cropland to support the total number of allotment acres resulting from the transfer, as provided in the third sentence of section 722.420(b)(2) quoted in note 7, supra.
 
 
 [9]
 The regulations do not speak of a "transfer" yield per se. They define the yield for transfer or "productivity adjustment" purposes as the "finally determined payment yield established for the farm for the year preceding the year the transfer is to take effect." 7 C.F.R. 722.420(b)
 
 
 [10]
 This expectation is not explicit in the regulations but is logically apparent from their overall scheme and evident from the testimony
 
 
 [11]
 The yields in this example were taken from the facts of the government's suit against T.A. Wartes, et al. The government alleges the County Committee approved these yields to further the schemes, described below, in which their members also played some role. The government's brief states with respect to the 140-pound transfer yield:
 "When no historical production data existed for a farm, the county committee 'established' an average yield for the land. Here, the county committee (the same one which was later suspended) established a 1969-71 yield of 140 pounds of cotton per acre, despite the fact that average yields for the region were between 400 and 500 pounds per acre." Government Brief at 25 n. 23.
 It explained how the 685 pound payment yield was achieved, as follows:
 "In 1972, this same [.8-acre] plot produced 1,776 pounds of cotton per acre, giving it an average yield from 1970 to 1972 of 685 pounds per acre. The astounding yield in 1972 was attributable to the use of farming techniques economically unjustifiable on a normal sized farm, but this plot was being specially cultivated to seed the scheme." Id. at 25.
 
 
 [12]
 2,800 (the number of pounds transferred from B calculated at B's 280 pounds per acre transfer yield for the 100 allotment acres transferred) divided by 685 (the transfer yield per acre of receiving Farm A) equals 40.9
 
 
 [13]
 Payments can be substantially inflated even if allotments are not increased (but are merely maintained) in the transfer because they will assume the higher payment yield of the receiving farm without being decreased by the "productivity adjustment."
 
 
 [14]
 For purposes of the payment limitation, the regulations define "person" as follows:
 "Subject to the provisions of this part, the term 'person' shall mean an individual, joint stock company, corporation, association, trust, estate, or other legal entity. In order to be considered a separate person for the purpose of the payment limitation, in addition to the other conditions of this part, the individual or other legal entity must
 "(a) Have a separate and distinct interest in the land or the crop involved,
 "(b) Exercise separate responsibility for such interest, and
 "(c) Be responsible for the cost of farming related to such interest from a fund or account separate from that of any other individual or entity." 7 C.F.R. Sec. 795.3.
 Section 795.15 provides limitations on when a party performing custom farming, or one having an interest in such a party, can be considered as being separate from the person for whom the custom farming is performed.
 
 
 [15]
 This provision states:
 "A partnership, joint venture, tenants-in-common, or joint tenants shall not be considered as a person but, notwithstanding the provisions of Sec. 795.3, each individual or other legal entity who shares in the proceeds derived from farming by such joint operation shall be considered a separate person except as otherwise provided in this part and shall be listed as a producer for payment purposes on program documents. The payment shares listed on the program documents for each individual or other legal entity shall be the same as each individual or other legal entity shares the proceeds derived from farming by such joint operation.
 "Notwithstanding the foregoing, each individual or other legal entity who shares in the proceeds derived from farming by such joint operation shall not be considered as a separate person unless the individual or other legal entity is actively engaged in the farming operations of the partnership or other joint operation. An individual or other legal entity shall be considered as actively engaged in the farming operation only if its contribution to the joint operation is commensurate with its share in the proceeds derived from farming by such joint operation. If the contribution consists substantially of capital, such capital must have been contributed directly to the joint operation by the individual or other legal entity and not acquired as a result of (a) a loan made to the joint operation, (b) a loan which was made to such individual or other legal entity by the joint operation or any of its members or related entities, or (c) a loan made to such individual or other legal entity which was guaranteed by the joint operation or any of its members or related entities." 7 C.F.R. Sec. 795.6.
 
 
 [16]
 An audit in 1971 had also revealed some problems with the administration of the upland cotton program in Gaines County
 
 
 [17]
 The ASCS determination does not state whether this 150-pound yield was "assigned" by the County Committee or was based on actual production. See note 11, supra
 
 
 [18]
 Lemmons' involvement in other schemes is also set out in a letter of determination filed in the government's suit against Earl Bowman, et al. (Appeal No. 81-1248). For the purposes of our decisions we need not untangle the facts of each alleged scheme, and leave that task to the district court on remand
 
 
 [19]
 And, in a separate count, the government claims $334,841.50 in damages from Batson and SPLC under the False Claims Act, 31 U.S.C. Secs. 231-35. It alleges that in April 1973 Batson, for purposes of establishing the amount of 1973 crop year payments to which Farm D-342 would be entitled, certified that such farm's 1972 cotton production (on the basis of which its 1973 entitlements would be calculated) was 1,125 pounds per acre when, as Batson knew, the 1972 crop on this farm had been destroyed, and that on June 25, 1973 Batson (for himself and SPLC) certified all program terms and conditions had been complied with on this farm and requested 1973 program payments to be made in respect to it. The payments so requested were made, in the amount of $167,487.75, apparently in July 1973
 
 
 [20]
 The following is a list of payments which each defendant-appellee received: Don H. Wilson, $53,980.38; H.C. Thomas, $53,980.38; Dennis Banta, $3,020; John H. Stockton, Sr., $54,132.86; T.V. Leopard, $54,132.86; Jimmy Crook, $53,980.38; Marvin Schulman, $53,980.38; Robert Freske, $53,980.38; John Moncure, $53,980.38; Sidney Carter, $53,132.86; Bobby G. Odom, $54,132.86; Winston Odom, $25,922.78; James R. Odom, $54,132.86; and Leslie Aiken, $43,001.32
 
 
 [21]
 Section 714b(c) states:
 "No suit by or against the Corporation shall be allowed unless (1) it shall have been brought within six years after the right accrued on which suit is brought, or (2) in the event that the person bringing such suit shall have been under legal disability or beyond the seas at the time the right accrued, the suit shall have been brought within three years after the disability shall have ceased or within six years after the right accrued on which suit is brought, whichever period is longer."
 It provides further that:
 "Any suit by or against the United States as the real party in interest based upon any claim by or against the Corporation shall be subject to the provisions of subsection (c) of this section to the same extent as though such suit were by or against the Corporation ...."
 The district court determined this provision to be applicable after rejecting the limitations period in 28 U.S.C. Sec. 2415(b) on actions brought by the United States, which are grounded in tort. It also rejected the applicability of 28 U.S.C. Sec. 2415(a), which generally provides for a six year limitation on damage suits, founded on express contracts or those implied in fact or in law, brought by the United States. In choosing 15 U.S.C. Sec. 714b(c), the district court stated:
 "It appears the more applicable statute of limitations is ... Sec. 714b(c) which governs suits by or against the Commodity Credit Corporation (CCC). The payments in these actions were disbursed by the CCC; the Upland Cotton Price Program provides that the program is to be carried out by the CCC, 7 U.S.C. Sec. 1444(e)(10); and the government alleges jurisdiction under the Commodity Credit Corporation Act."
 
 
 [22]
 The following chart lists the date of payments involved in the individual suits, and the date each suit was filed:
 PAYMENTS
 CASE ISSUED CASE FILED
--------------------- ---------------- ---------------
Dale Leverett and
 Cletus Leverett *, 1972 June 4, 1979
Dale Leverett and
 Wayne Leverett July 9, 1973 June 4, 1979
Lois Prather July 3, 1973 June 4, 1979
T.A. Wartes, et al. July 6, 1973 July 3, 1979
A. Earl Jones, et al. July 5, 1973 July 3, 1979
Don H. Wilson, et al. July 5, 1973 July 3, 1979
Earl Bowman, et al. July 12, 1973 July 12, 1979
Glynn Batson, et al.:
 Glynn Batson Aug. 3, 1972 June 4, 1979
 Glynn Batson July 9, 1973 June 4, 1979
 SPLC ** Sept. 8, 1972 June 4, 1979
 Johnny Lemmons July 24, 1972 June 4, 1979
 Johnny Lemmons July 5-12, 1973 June 4, 1979
*The exact 1972 payment date is not reflected.
**SPLC also received payments in 1973.
 
 
 [23]
 In the Wurts case, the government's right to recover such erroneous payments was not founded on a statute or regulation but on "the Government's long-established right to sue for money wrongfully or erroneously paid from the public treasury." 303 U.S. at 416, 58 S.Ct. at 638, 82 L.Ed. at 934
 
 
 [24]
 The case before us, however, is not based on fraud but on the refund of an erroneous subsidy payment. The court below, in rejecting the applicability of the three year statute of limitations on suits brought by the United States which are founded on a tort, stated that "[i]t appears to the Court that the government has not actually sued for fraud, but rather is suing for a refund of payments. Despite the fact that an alleged scheme or device described in the regulations may in certain circumstances encompass fraud, these particular actions are strictly for the recovery of payments." We agree with the district court's conclusions on this point
 The appellees in one of the suits contend that transfers or reconstitutions, which were found by the ASCS to be a "scheme or device," were contracts between them and the United States. The transfers, if violative of section 722.817 or section 795.16, therefore, were breaches of the very contracts which they created, and the government's cause of action necessarily accrued at the time of breach.
 It is unnecessary for us to consider what, if any, contractual relationship arises out of allotments and their transfer because the government's cause of action is not founded on contract. It is founded on section 722.817 and section 795.16, which gives it the specific right to the refund of payments if the ASCS determines that certain actions have been taken by a producer or a recipient of payments.
 
 
 [25]
 Likewise, the cause of action against Batson and SPLC under the False Claims Act, 31 U.S.C. Secs. 231-35, referenced in note 19, supra, is not barred. The claim was made June 25, 1973, and was paid in July 1973, and suit was filed in respect thereto on June 4, 1979, which is within the six year limitations period provided in 31 U.S.C. Sec. 235. See United States v. Ekelman & Associates, Inc., 532 F.2d 545, 551-52 (6th Cir.1976)
 
 
 [26]
 In its Appellant's Brief in these cases the government states: "The applicable statute of limitations in these cases is 15 U.S.C. Sec. 714b(c)." Id. at 10. The government's Reply Brief states:
 "Both the United States and the district court have characterized these cases as suits for the recovery of payments issued by the CCC. Actions by or on behalf of the CCC are specifically governed by 15 U.S.C. Sec. 714b(c), which provides a six-year statute of limitations measured from the time the right of action accrues. [Id. at 1.]
 "....
 "The limitations periods provided in 28 U.S.C. Sec. 2415(a) and (b) have no applicability. By its terms, that statute applies only to actions brought by the United States for which Congress has not otherwise provided a limitations period." [Id. at 2.]
 
 
 [27]
 Except as below noted, we have found no pleading or motion of the government in the district court which addresses the limitations issue regarding the 1972 payments, or alleges that the appropriate official did not know and could not reasonably have known the material facts concerning the 1972 payments until a time six years or less prior to suit, or relies on section 2416(c) in this regard
 In each of the cases under consideration the government filed below its "Memorandum of Points and Authorities in Support of Plaintiff's Consolidated Opposition to Defendants' Motions to Dismiss or, in the Alternative, for Summary Judgment and Plaintiff's Cross-Motion for Summary Judgment." So far as we can determine, this document is the only place where the record below contains any contention by the government with respect to the 1972 payments not being time barred, and the entirety of the government's position in that regard is set out on page 12 thereof as follows:
 "Defendant Johnny Lemmons in the Batson case was sued for 1972 overpayments as well as overpayments in 1973. Lemmons claims that regardless whether suit was timely filed for 1973 payments, it was time barred for payments made in 1972 more than six years before suit was filed.
 "28 U.S.C. Sec. 2415(a) provides that actions brought by the United States must be filed 'within six years after the right of action accrues or within one year after final decisions have been rendered in applicable administrative proceedings' (emphasis added). The final decision regarding the 1972 payments in Lemmons' case was rendered June 9, 1978. The suit in question was filed June 4, 1979. Thus, this case, too, was timely filed.[9]
 "----------
 "[9] The O'Neil, Leverett, and A. Earl Jones cases also come within this provision, thus satisfying either and both criteria for timely filing."
 
 
 [28]
 The amendment in question was contained in section 5 of the act of June 7, 1949, which effected numerous changes in the Commodity Credit Corporation Charter Act, and the portion of the House Committee report on this legislation dealing with section 5 states in relevant part:
 "The principal change effected by this section of the proposed bill, as amended, is ... to permit certain suits against the United States ... to be brought in the Court of Claims.... In addition, the period of time within which suits may be brought on the claims by or against the Corporation is extended from 4 years to 6 years in order to make the period uniform with the statute of limitations generally applicable to claims against the Government.
 "The bill also provides that a claim which would otherwise be barred by the statute of limitations may be pleaded by way of set-off or counterclaim in a suit brought on a claim which arose before the statute had run upon the first claim....
 "The provision restoring jurisdiction over claims against the United States based upon a claim against the Corporation to the Court of Claims and the provision for a uniform 6-year statute of limitations was recommended by the Chief Justice of the Court of Claims." H.R.Rep. No. 418, 81st Cong., 1st Sess. 8, 9 (1949) (emphasis added).
 
 
 [29]
 See Senate Rep. No. 1328, 89th Cong., 2d Sess. (1966), quoting with approval H.R.Rep. No. 1534, 89th Cong., 2d Sess. (1966), as reprinted in 1966 U.S.Code Cong. and Adm.News 2502 at 2509:
 "The committee points out that the bill does not affect existing statutes of limitations. For example, section 235 of title 31, United States Code, concerned false claims against the Government and provides that actions on such matters must be brought within 6 years. [Other examples given.] ... There are other such statutes in the law at the present time. Not all of them are consistent with the limitations proposed in this bill. In view of the specialized nature of the other provisions, the committee has concluded that they would be better dealt with at a subsequent time on an individual basis, if in fact any change would appear to be desirable."
 
 
 [30]
 Moreover, even if section 2416(c) were applicable and had been raised by the government below, it appears quite likely that the government's claims for refund of the 1972 payments would be time barred in any event. While the government asserts it lacked the requisite knowledge until August 1, 1973, section 2416(c) only tolls limitations where the material facts "reasonably could not be known." See United States v. City of Leesville, 389 F.Supp. 943 (W.D.La.1975). We note that an investigation or audit into the 1971 crop payments in Gaines County had been completed sometime in 1972, disclosing somewhat similar abusive reconstitutions, and that the office of the Inspector General of the Department of Agriculture had an additional investigation pending into the matters here at issue, with the knowledge of the Deputy Administrator, as early as February 1973. In mid-April 1973 the office of the Inspector General reported, apparently to Washington, on a meeting of the State Committee, stating in part: "There is pretty reliable information that there is a rather wide-spread scheme being carried out by the farmers in Gaines County in the lease and purchase of cotton allotments.... [A] great number of reconstitutions that have been made are not legitimate.... [S]mall farms with leases are being split up and combined with other farms to purchase or lease for the sole purpose of being able to produce cotton with the high payment yields."
 Further, we observe that the House Judiciary Committee Report, on the portion of P.L. 89-505 which enacted section 2416, states concerning its paragraph (c): "The committee understands that the principal application of this exclusion will probably be in connection with fraud situations." H.R.Rep. No. 1534, 89th Cong., 2d Sess., (1966), as reprinted in 1966 U.S.Code Cong. and Adm.News 2502 at 2507. As pointed out in the text, infra, fraud is not charged here.
 
 
 [31]
 The only exception is count IV in the Batson action which relates to the June 25, 1973 claim paid in July 1973 and is grounded on the False Claims Act. See note 19, supra. We have held that this count is within the six-year period allowed by 31 U.S.C. Sec. 235. See note 25, supra
 
 
 [32]
 The only cases in which refunds of 1972 payments were sought are Batson, et al. (Appeal No. 81-1242), and Leverett, et al. (Appeal No. 81-1243). Consequently, of the appeals now before us, our holding as to the 1972 payments affects only these two. Since each of these two cases also involves 1973 payments, our holding as to the 1972 payments is not entirely dispositive of any of the seven cases appealed
 
 
 [33]
 As noted earlier in part IC of this opinion dealing with the facts of the individual cases, contrary to what might be implied from this portion of the district court's memorandum, most of the appellees were determined to have violated or evaded other specific regulatory provisions, particularly those respecting payment limitations, either in addition to or as a part of the section 722.817(b)(1) violations
 Further, two of the suits (Leverett, et al., Appeal No. 81-1243, and Prather, Appeal No. 81-1244) do not involve section 722.817 at all, but are entirely grounded on the payment limitation regulations. In a third suit (Don H. Wilson, et al., Appeal No. 81-1247), the section 722.817 determination was under its subsection (a), denouncing factual misrepresentations, not under its subsection (b)(1); also in this case there was a determination under section 795.16. And, of course, the False Claims Act count in Batson, et al. (Appeal No. 81-1242) does not involve section 722.817(b). See note 19, supra.
 
 
 [34]
 Appellees correctly point out that prior to its amendment effective July 11, 1973 (a few days after most of the 1973 payments here in issue were made), section 722.817 did not contain the word "knowingly." However, as appellees admit, the administrative determinations here in issue were all made on the basis of the regulation as amended July 11, 1973, and we do not understand appellees to claim that there was a failure to determine that the appellees knowingly adopted a scheme or device tending to defeat the purpose of the program. Appellees complain that such application of the amended regulation is improperly retroactive. We reject this contention. We are not dealing with a criminal or a civil penalty statute. See Harisiades v. Shaughnessy, 342 U.S. 580, 593-95, 72 S.Ct. 512, 520-521, 96 L.Ed. 586 (1952). And, as First Amendment interests are not implicated, we are not concerned with any "chilling" effect of the breadth of the old regulation. The "new" regulation is more favorable to appellees than the old, and narrows, rather than broadens, the scope of the proscribed conduct. Hence, this is not a case like Miller v. United States, 294 U.S. 435, 439, 55 S.Ct. 440, 441, 79 L.Ed. 977 (1935), relied on by appellees, where the allegedly retroactive regulation enlarged the substantive obligations of the party objecting to the retroactivity. Further, the "old" regulation had never been ruled invalid. Appellees had no vested interest in any potential infirmity which the regulation may have had in this respect prior to July 11, 1973, nor have they claimed that they in any way relied on any such perceived invalidity in the regulation as it then existed
 
 
 [35]
 While Kolender v. Lawson, --- U.S. ----, 103 S.Ct. 1855, 75 L.Ed.2d ---- (1983), may caution against literal application of the Hoffman Estates' language concerning facial challenges for overbreadth and vagueness of criminal laws, we do not read Kolender as being applicable in a case such as this. Kolender emphasizes that it deals with a penal statute: "... the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness ...," id. at ----, 103 S.Ct. at 1858; "... where a statute imposes criminal penalties, the standard of certainty is higher." Id. at ---- n. 8, 103 S.Ct. at 1859 n. 8. Additionally, respecting economic regulation, Kolender approves Hoffman Estates, stating, "the [Hoffman Estates] Court emphasized that the ordinance ... 'simply regulates business behavior' and that 'economic regulation is subject to a less strict vagueness test because its subject matter is more often narrow.' " Id. Finally, Kolender rests in significant part on First Amendment grounds, viz: "Our concern here is based upon the 'potential for arbitrarily suppressing First Amendment liberties ....' [Citing Shuttlesworth v. City of Birmingham, 382 U.S. 87, 91 [86 S.Ct. 211, 213, 15 L.Ed.2d 176] (1965) ]." Id. at ---, 103 S.Ct. at 1859. Concern was also expressed as to "the constitutional right to freedom of movement." Id. No similar concerns are present in our nonpunitive economic regulation
 
 
 [36]
 See also 7 U.S.C. Sec. 1421(b) directing the Secretary of Agriculture to take the following factors into consideration in determining the level of price support above the prescribed minimum:
 "(1) the supply of the commodity in relation to the demand therefor, (2) the price levels at which other commodities are being supported ..., (3) the availability of funds, (4) the perishability of the commodity, (5) the importance of the commodity to agriculture and the national economy, (6) the ability to dispose of stocks acquired through a price-support operations [sic], (7) the need for offsetting temporary losses of export markets, (8) the ability and willingness of producers to keep supplies in line with demand, and (9) in the case of upland cotton, changes in the cost of producing such cotton."
 
 
 [37]
 As the Supreme Court stated in Letter Carriers:
 "[T]here are limitations in the English language with respect to being both specific and manageably brief, and it seems to us that although the prohibitions may not satisfy those intent on finding fault at any cost, they are set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with, without sacrifice to the public interest. '[T]he general class of offenses to which ... [the provisions are] directed is plainly within [their] terms, ... [and they] will not be struck down as vague, even though marginal cases could be put where doubts might arise.' United States v. Harriss, 347 U.S. 612, 618, 74 S.Ct. 808 , 98 L.Ed. 989 (1954)." 413 U.S. at 578-79, 93 S.Ct. at 2897-2898.
 
 
 [38]
 This decision involved the dismissal of a nonprobationary federal employee under a standard which permitted removal or suspension "only for such cause as will promote the efficiency of the service." The Supreme Court quoted with approval the following statement of Judge Leventhal in Meehan v. Macy, 392 F.2d 822, 835 (D.C.Cir.1968), modified, 425 F.2d 469, aff'd en banc, 425 F.2d 472 (1969):
 " '[I]t is not feasible or necessary for the Government to spell out in detail all that conduct which will result in retaliation. The most conscientious of codes that define prohibited conduct of employees include "catchall" clauses prohibiting employee "misconduct," "immorality," or "conduct unbecoming." '..." 416 U.S. 134 at 161, 94 S.Ct. 1633 at 1647, 40 L.Ed.2d 15.
 
 
 [39]
 Appellees particularly rely on Bence v. Breier, 501 F.2d 1185 (7th Cir.1974), cert. denied, 419 U.S. 1121, 95 S.Ct. 804, 42 L.Ed.2d 821 (1975); United States v. Diaz, 499 F.2d 113 (9th Cir.1974); and Katharine Gibbs School (Incorporated) v. F.T.C., 612 F.2d 658 (2d Cir.1979), in connection with their vagueness argument. In our view these cases are inapposite. The regulation held invalid in Bence was more punitive in nature than section 722.817(b) and, unlike it, implicated "sensitive first amendment freedoms." 501 F.2d at 1190. Diaz involved a criminal statute. Katharine Gibbs School was based on a statutory provision which explicitly required the regulations to "define with specificity" the prohibited acts. 612 F.2d at 662
 Appellees also rely on general statements by Adams at the administrative hearings that he could not state the purposes of the program. This is not controlling. The question is not who can give a comprehensive statement of all the program's purposes, but rather whether section 722.817(b)(1) can be constitutionally applied to this character of conduct knowingly adopted as a scheme or device which tended to defeat the purpose of the program. See United States v. Dotterweich, 320 U.S. 277, 285, 64 S.Ct. 134, 138, 88 L.Ed. 48 (1943). Adams did not suggest that the purpose of the program was so unknowable that it could not be determined whether this sort of scheme or device tended to defeat it.
 
 
 [40]
 Moreover, both in the district court and before this Court, the presentation of these seven cases, nearly all of which involve multiple defendants-appellees having in many instances somewhat diverse individual circumstances, has been on an essentially general, across-the-board basis and has for the most part failed to focus on a particularized factual and legal analysis of the individual situations of the forty-six different defendants-appellees
 
 
 [41]
 And, we make no ruling as to whether this issue can be determined on summary judgment
 Similarly, we do not determine whether 7 U.S.C. Sec. 1385 precludes all factual review, or whether some character of limited "arbitrary and capricious" type review is nonetheless available. Compare Gross v. United States, 505 F.2d 1271, 1279 (Ct.Cl.1974) (indicating possibility of limited factual review), and Boyd v. Secretary of Agriculture, 459 F.Supp. 418, 424 (D.S.C.1978) (same), with Mario Mercado E. Hijos v. Benson, 231 F.2d 251 (D.C.Cir.1956) (no review). The distinction may, in any event, prove to be immaterial. The government does not contend that issues of law or due process are not reviewable; and it claims the administrative determinations are in any event not arbitrary or capricious.
 And, there may be a further potential problem related to the application of section 1385. In portions of at least some of the ASCS "final determinations" relied on by the government it appears rather difficult to identify or understand just what "facts" were determined thereby. This surface lack of clarity arises, inter alia, from the generality of the wording, or from an elliptical or technical form of expression, or from a seeming lack of "connecting" or "background" facts needed to make evident the intended relevance of other facts or conclusions stated. It may well be that on a closer reading, greater clarity will be found to exist. Or, any lack of clarity may not be significant or determinative in the particular instance. However, it is not inconceivable that the district court will need to determine whether a given level of lack of clarity in a portion of a "final determination" prevents that determination (or portion thereof) from enjoying section 1385 "conclusive" factual effect where the facts so determined cannot be reliably identified. The district court may also need to determine whether any such lack of clarity in a "final determination" can be remedied either by resort to matters outside the "final determination" itself, such as other portions of the administrative record or matters of which proper agency notice may be presumed, or by administrative remand.
 Finally, because of the immediately foregoing matters and the factors referenced in note 40, supra, our remand does not foreclose the possibility, albeit seemingly remote, that in one or more particular individual instances (where closer examination may reveal that the facts administratively determined are not of the type which the text of this opinion generally outlines in its discussion of the facts of the several cases) the conduct found by the ASCS as the basis for the refund demand is not fairly within the scope of the refund regulations.